Good morning, Justices. May it please the Court, my name is Michael Bruck and I represent Appellant Lumbermens Mutual Casualty Company. I'd like to reserve three minutes of my time for rebuttal. This matter presents a dispute between two insurance companies as to how defense expenses and indemnity payments made on three underlying lawsuits should be allocated between four layers of coverage. Each of the claims were defended and settled by the insurance companies. Therefore, there's no dispute as to whether or not the insured had coverage. This is merely a dispute between the insurance companies in how to sort out the payments. The insured U-Haul had four layers of insurance coverage. The first three layers were through Appellee Republic Western Insurance Company. The fourth is through my client Lumbermens Mutual Casualty Company and a high-level excess policy. There was a bottom amount that U-Haul was self-covered, right? There's also a $25,000 self-insured. Do you consider that a layer? You could. It's a self-insured retention. So ---- I'm just wondering, for your argument, are you just setting that one aside and ---- We're setting that one aside. So you thought yourself as the fourth layer, then? That's how we set it up, as the fourth layer. Republic has the first three layers of insurance policies. Each of these policies have what are known as a per-occurrence limit of liability and a per-aggregate or aggregate liability ---- limit of liability. These can be thought of as buckets. There's an occurrence bucket and an aggregate bucket. And as amounts are spent on a particular claim, those buckets are filled. And once they're filled, then the upper-layer policy is exhausted. This dispute is really over how we should fill the buckets, whether defense expenses paid to defend claims should go into these buckets, fill them, and then, therefore, trigger the next layer of coverage. The issues are largely legal issues over the interpretation of insurance policies. There are rulings on summary judgment that should be reviewed de it's important to note that each of Lumberman's positions in this case argue in favor of greater coverage for the insured U-Haul. And if there's any ambiguities found in an insurance policy, it should be construed in favor of providing greater insurance coverage to the insured. Therefore, if there's any doubt as to the meaning or intent of the language in these policies, they should be construed in favor of the positions being offered by Lumberman's mutual. Does that presumption include gaps in coverage as well as extent of coverage? You know, there are no gaps. I think that is a misnomer that's been used in this case. And going back to the bucket analogy, once a bucket is filled, it triggers the next layer of coverage. And there's there in the record, there's some description of gaps, and I think that that is a misnomer. And this case, I believe, is not about gaps in coverage because it's really in how the layers of coverage should be filled going upward, if that answers your question. I think the argument was that U-Haul would not want gaps, and therefore, that's a given in the analysis. I think that's true. I think that's true, that the U-Haul sought to have a comprehensive, multilayered insurance program without gaps, presumably. But again, gaps are not an issue here because there are no gaps in coverage. There are these layers of coverage. Once one is filled, the next one is triggered, and it's a misnomer. Our first issue Is the biggest issue really boiled down to the subject-to clause? It may. There are a number of issues, and I can jump to that one if you'd like. And really, this is our first issue on appeal, which is whether loss adjustment expenses or defense expenses are included in the products aggregate of the first two layers of Republic policies. The per-occurrence limit there describes damages, including legal fees, court costs, et cetera. The aggregate limit describes damages because of bodily injury. Prior to that, it says, subject to the limit of each occurrence or each accident, the total liability of the company for all damages because of bodily injury shall be. And in reading that, the Republic-Western used two distinct definitions, or two distinct descriptions to describe their limits. These are two distinct provisions in describing damages or what goes into these proverbial buckets, and they should be given two distinct meanings. Now, the subject-to clause used in this description lends itself to that argument. It means subject to suggests that this means one means something different from the other. And this is common in insurance policies where the per-occurrence limit might be $1 million, the aggregate limit might be $2 million. So when you're speaking of the aggregate limit, you're saying, well, subject to the per-occurrence limit, which might be $1 million, the aggregate limit is, and then it's described. So if Republic wanted its aggregate limit to track, and the aggregate limit is $1 million, and follow and be identical to its per-occurrence limit, it could have said so, and it didn't. It described them differently. It described them as damages because of bodily injury. It does not describe it in terms of defense expenses. And the subject-to also differentiates the two clauses. And on that point, the per-occurrence limit, it's not incorporated, and it can't be, because it states, for all damages, including legal fees, court costs, interest, and other allocated loss expenses arising out of the same occurrence. So if you interpose that per-occurrence limit into the aggregate limit, that means that the aggregate limit can only arise out of one occurrence. And that's an absurd reading of this clause. And it should be rejected. Why, I guess I'm having trouble understanding why that's the natural flow of the language, because you could have more than one occurrence, and if you only had one occurrence, then you wouldn't have an issue, correct? True. Okay. So then it's kind of irrelevant on that point, but if you had more than one occurrence, I'm somewhat, I guess, bemused by your conclusion that you would have to – that you wouldn't be able to read that into the second clause. Well, the – we're just using the language they have, and it's not that we're using the language they have, and it's, you know, damage arising out of the same occurrence, and to – you can't interpose arising out of the same occurrence into an aggregate limit. An aggregate limit usually means more than one occurrence. It's an aggregation. And so – and as we struggle with this language, it indicates that it is ambiguous, and that it should be construed in favor of finding greater coverage. I hope that responded to the – Well, I guess I'm solving some difficulty. It seems to me that what – as I read it, the aggregate limit, you wouldn't – it's simply saying, by making it subject to a per-occurrence limit, and then how that's defined, is you certainly couldn't have any individual occurrence dropped into your bucket for an amount more than the contractual language defining per-occurrence. And that's not really taken to account in your argument, is it? I'm not sure I understand. Because it's an aggregate amount, but you really can't square that with a per-occurrence amount. Well, it's an aggregate amount, and the aggregate limit's an aggregate amount, and the per-occurrence limit's a per-occurrence amount. And the aggregate is the aggregate of individual occurrences, correct? Well, it's the aggregate of exactly what it says, which is damage is because of bodily injury. Because of bodily injury and property damage, correct. Right, included in the completed product's hazard. And that's what the aggregation is there. It's not the aggregation of all amounts paid for all occurrences, which it perhaps could have said. And so because the language used is different, I mean, the basic contract construction is when you use different language, you've meant something different. They use different language to describe these two different concepts, and they should be interpreted differently. They cannot be interpreted the same way. If they wanted them to be identical, they could have stated them identically. So you're just saying that because it's using damages for bodily injury and property damage, that that's a different construct than what goes into the per-occurrence bucket? Exactly. Exactly. And it does not when you're talking when Republic spoke of the per-occurrence limit, it specifically included defense expenses. When it spoke of the aggregate limit, it does not. And if it meant to include defense expenses, it would have and should have specified. I'd like to move to point two, which is that the Martinez settlement exhausted Republic's product's aggregates, but did not exhaust Lumberman's nearly identical product aggregate. This is a summary judgment issue that the — there was the Martinez case, which is an over $20 million case that was settled by Republic and Kemper or Lumberman's, and Lumberman's paid $13 million of its limit on that claim. On summary judgment in this case, the Court ruled that that settlement exhausted Republic's product's aggregate limit of liability. Lumberman's had a very similar, if not nearly identical, product's aggregate limit of liability, but the Court did not rule likewise. It's an inconsistent ruling on a legal issue, and if the Court ruled likewise, it would have found that Lumberman's $13 million limit of liability was exhausted by the Martinez claim and was — and, therefore, there were no funds or coverage available for the subsequent Fernandez case. This is an undisputed fact. Lumberman's limit is $13 million. It paid $13 million. If the Court ruled that, as it did for one party, the lower-level carrier, that Martinez exhausted the aggregate, it should have ruled likewise for the other carrier. Is this the — is this the one where the issue came up of whether it was — you were raising it 10 months too late? This is an issue that I don't believe was raised too late. It was one — it's related to that where, in an abundance of caution, Lumberman's sought to file an amended counterclaim in affirmative defense, spelling out this issue specifically. But on this record, though, subsequent to that, summary judgment was heard, was briefed, and ruled on, and the Court did not rule likewise. It denied the motion, denied Lumberman's motion, granted Republic's motion on these same and similar grounds. Therefore, it's a de novo review of that summary judgment is what we're asking for. It's unrelated to the pleading issue that arose at that time. The pleadings in this case are sufficient to have raised this issue and to put it in. It's a declaratory judgment action, and I see that I have less than a minute, and I'd like to reserve it. You may. Thank you. Good morning. May it please the Court. My name is Bruce Friedman. I'm with the firm of Rubin, Fiorella, and Friedman, and I'm here to urge this Court to affirm the judgment of the district court. Because it was the subject of some interaction, I'd like to address this aggregate-slash-occurrence issue. I think that my opponent has really tortured the concept of the interaction between occurrences and aggregates. Aggregates are not something that sit on an island. Aggregates are related to occurrences. The aggregate limit is eroded or exhausted either by one of two things. You have an occurrence limit, which is the equivalent of the aggregate limit, in which case if you pay your occurrence limit, you're simultaneously exhausting your aggregate limit. Or you could have an aggregate limit which is greater than your occurrence limit, in which case you would have multiple occurrences accumulating to exhaust your aggregate limit. Picture concentric rings. If expenses are included within the occurrence limit, they necessarily are included within the aggregate limit. The argument makes no sense. What happened in the Court below was a classic case of an insurance company drumming up excuse after excuse in an effort to avoid coverage. And the interesting thing that we're learning on this appeal is that while Lumbermans was interested in throwing the entire kitchen sink at this case, they themselves admit that they may have overlooked the defense that they could have pursued that may have been sustainable. So I think that while they approached this in a much more academic perspective, their own litigation tactics are what caused them defeat in the Court below by failing to raise these defenses in a timely manner in accordance with the Court's scheduling order. I think that Judge Campbell demonstrated enormous patience with the litigation tactics that were employed by Lumbermans. When he denied their post-trial motion in his May 30, 2007, decision, he made the following observation. This case has seen more briefing, rebriefing, and re-argument of issues than any case in the Court's memory. That says something to me, and I trust it says something to this bench as well. Now I'd like to address the individual points to which Lumbermans would assign error. In the claim stage of this matter, the only issue that ever came up and was pursued and the one that was pursued in the Court below was whether loss adjustment expenses should be included in the limit of liability, and therefore as the limit of liability is eroded or exhausted, you would count the indemnity paid plus the loss adjustment expenses paid. That was the issue in the case, and Judge Campbell found that in accordance with the language utilized in the policy, he didn't go beyond the language of the policy, he found that the language clearly and unambiguously established that defense costs were included in the limit of liability and therefore should be counted toward the issues of erosion of that limit and exhaustion of that limit. The absurdity of their argument can be assessed in the following example. Let's assume Lumbermans' argument is correct on that, and that the insured actually has to reach into his pocket to make a payment in order for the insured's expenses to be included in exhausting the limit. Well, if that were the case, then the insurance company would have a disincentive to pay defense costs because they could say let's do nothing, let's let the insured reach into its pocket to pay these defense costs, and if we do that, we can then reduce our limit of liability by reimbursing them for those costs. That makes no sense. And it's not the way the policies were intended to be construed. And Judge Campbell absolutely positively got it right. Contrary to what my colleague has asked the Court to consider, this is not a question of the Court's inappropriate denial of their motion for summary judgment on the issue of the exhaustion of their aggregate limit by reason of payment of the Martinez claim. There's some history that needs to be taken into account. What happened here is that the defendant recognized that they had never asserted this as a defense in their answer and then made a motion to amend their answer long after the time limit prescribed by the Court's scheduling order. And their motion to amend their answer was properly denied. That was the 10 months late. That's correct. And then, as I understand it, the that was in support of a case management order submitted by Judge Campbell. That's correct. And is it does the record show also they knew this for over two years before, even before the case was transferred from the State court to the Federal court? As a matter of fact, yes. And in Judge Campbell's decision denying their motion to amend, wherein they alleged to Judge Campbell that the reason they're late is because they just found out about it, we pointed out to Judge Campbell, and Judge Campbell observed in his decision that, in fact, Lumbermans had written a letter in May of 2002 in which they raised the issue and simultaneously withdrew that defense. Now, that particular issue should never have appeared in their motion for summary judgment because they had already been precluded on the issue. They nonetheless dedicated a paragraph or two to that argument in their motion for summary judgment, and in response, Republic Western and U-Haul said, this has already been rejected by Judge Campbell, and therefore, it's not an appropriate time to re-argue this issue. And in denying the motion for their motion for summary judgment and in granting our motion for summary judgment, Judge Campbell did not even address their argument as he shouldn't have. Now, after the motions for summary judgment were decided, Lumbermans made a motion for reconsideration and clarification. They pointed out to the judge that he had overlooked two issues. He had overlooked the issue of equitable estoppel, and he had overlooked the issue of whether the expenses eroded the aggregate limit. They did not announce to him that he had overlooked this Martinez payment issue because they knew they shouldn't have even raised that issue in the first instance. But to suggest that they did not have to raise the issue is not a legitimate argument to this Court for the following reason. The case proceeded after the motion for summary judgment and after their motion for amendment to the pleading had been denied. The case proceeded to a pretrial order in which the parties were directed to state the issues remaining in the case. And in the pretrial order that Lumbermans submitted, they made the following concession, which is entirely inconsistent with their position to you, that payment of their $13 million on the Martinez case exhausted their aggregate limit. Here's what they said in their pretrial order, which is found at AER 33. Issue 34, and I might point out that they listed over 100 issues in this pretrial order. Issue 34, and I'm quoting, the amount due plaintiffs from LMC with respect to the Fernandez claim is $1,242,376.72. Plaintiffs contend, yes, this is an accurate statement. Defendant contends, in view of the court's previous ruling that all of Republic Western's policies are defense within limits policies, paren, defendant respectfully continues to maintain its position to the contrary, close paren. LMC admits that it will owe money to plaintiffs with respect to the Fernandez settlement if LMC's estoppel defense is denied. This is their judicial statement in the trial court that they will owe money if the equitable estoppel defense is denied. That admission is entirely inconsistent with the position that they're now taking, that payment of the Martinez claim of $13 million eliminated any responsibility for further payment on the Fernandez claim. Kennedy. Was that pretrial order sufficient for the conclusion that there can be no exhaustion issue left? The only other exhaustion issue that was raised was adjudicated in the motion for reconsideration by Judge Campbell. And Judge Campbell concluded that defense costs are to be included in any calculation of the aggregate limit. Yeah. Okay. Now, in their brief, they also state that they did not really have to make this motion to amend, but just made it out of an abundance of caution. Abundance of caution is what they said. Yes. The abundance of caution argument. But, of course, as we've seen as the case progressed, they dropped that argument, and they never proceeded with the issue at trial. They never proved at trial that they made a payment to Martinez. They never proved at trial that the Martinez claim was subject to an aggregate limit or the same aggregate limit as the Fernandez claim. There's simply no proof that they introduced. And, of course, if they were just doing it because they thought they were being cautious, then they should have proceeded on the basis that the issue is live, and they permitted the issue to die not only once, but twice. What they're asking this Court to do, essentially, is to ignore the fact that Judge And simply permit them to have another bite of the apple. Well, it wasn't included in the final pretrial order. It was not. It was not raised. It wouldn't have come up in trial. You say it didn't. It didn't. Well, I guess this is a logical consequence of them not of them dropping the issue, which should never have been in their motion for summary judgment. But in the event, there was no effort to recoup the failure to include it in the pretrial order. There was not. At trial. Nor in their motion for rehearing. When they asked the judge to reconsider his denial of the summary judgment motion and cautioned the judge, hey, there are two issues out there that you didn't address. There was that third issue, this Martinez payment of $13 million that the judge hadn't addressed, but they didn't call that oversight to his attention because I believe it was not an oversight. It should never have been in their motion for summary judgment. But the only other point that I would like to make is that the issue, the sole issue in this case was the admission of the computer records to support the claim. You might touch on that for a minute. I'm having a little difficulty understanding it. But we dinosaurs are having a tough time getting into this new generation. When I tried lawsuits, we had file drawers and things. Essentially, we had this trouble with the witness who couldn't pull things back in. But essentially, if I understand it, that finally, while the district judge concluded that this data was properly a business record, he had the problem of the summary coming out. Do I understand correctly, eventually, the decision was made that the summary itself is a business record? I don't recall the precise way in which the judge addressed it. I can only point out what he said in his decision, if you'd like me to read that into the record. This is at AER tab 5, document 162. The documents represent data compilations concerning events at Republic Western, per-end payments, close per-end, semicolon. The data compilations were made at or near the time of those events by a person with knowledge, semicolon. The data compilations were kept in the course of Republic Western's regularly conducted business activity, and it was the regular business of Republic Western to make the data compilations. All of these facts were established by the testimony of a qualified witness, Mr. Matouche. Well, now, these data compilations, that's the basic data that comes in. I pay a check, and it shows on the computer record the check was paid in the date. What was happening, if I may, is as vendors' bills were coming in to Republic Western, they would scrutinize them, they would pay them, and they would enter them in their computer system so that Mr. Matouche would then press buttons to recall all of those payments, either by vendor number or claim number. I don't know how he accumulated those payments, but this is these are payments that an insurance company has to track to see if they have exhausted their aggregate limits. Well, my understanding was that the summary, the computer-generated summary of underlying data was itself undertaken in the ordinary course of business, and this isn't a litigation-generated summary. I think that there was a top sheet which the witness had prepared, and then the underlying data, which was the stuff that was made or recorded in the ordinary course of the company's business. And may I add to that? The authority of case on this, I know Weinstein talks about it, but what is the closest case to help us to rely on what Judge Campbell was doing? I would look at the – I keep forgetting the name of the case. The Caterbran decision, Ninth Circuit, 1988. The citation is 836 F. Second.  It's United States v. Caterbran. Okay. The case that is relied upon by Lumbermans was a case in which the Court actually did not admit the records because the witness was not a qualified witness to attest to the authenticity or reliability of the records. But here the judge was satisfied that the witness – that the records were generated in the ordinary course of the business and that the witness was qualified to attest to them. May I also add that the underlying bills, which were the backup for these summaries, were tendered to the defendant if they really cared, but the defendant was not interested in validating the accuracy of the bills. He was more interested in attempting to win this case on a technicality. As I understand, Lumbermans also raised the issue of how do we know this is a reasonable amount? That's correct. They did raise that. I mean, 10 times higher than it ought to be, and they're not checking on it. Does the – does the Republican – and you all have a responsibility to demonstrate reasonableness for each one of the charges. I don't believe that that is our duty. I think that the only thing we have to demonstrate is that we had a legal obligation to pay these expenses under the policy, and that's the only thing we have to pay.  But you understand that they have – if it's going to kick into them, they want to know that the charges are reasonable, not extensive, thus cutting them in earlier. You know, as a practical matter, Your Honor, these issues never, never come up. Insurance companies on higher excess layers do not audit the expenses of the layers below them. I know, but there's nothing in the record that that's what insurance companies do. Well, as a matter of fact, it is in the record. Well, they do, because they're tight and they are – There's nothing in the contract that requires it, is there? No, there's not. But, you know, this is something that could have been – these insurance companies were negotiating with one another as to how to fill this gap. Yeah. If at any time anybody was concerned about this, they could have asked. This is not a legitimate concern. This is another – Well, it depends on who has the burden of proof. If you have the burden of proof reasonableness, that they didn't ask doesn't matter. I don't think we had a burden of proof to prove reasonableness, Your Honor. I think that – Did they object on the basis of lack of reasonableness? They objected on virtually every base imaginable. So that's up before us now. So we have to make a determination as to whether or not you're required to prove reasonableness of each one of these data entries, and if so, whether you did. How did Judge Campbell handle the issue? I don't know. I don't recall how Judge Campbell handled the issue of reasonableness. If it was not in the – if it was not in the transcript of the trial or in his order, I would not have any independent recollection of how he handled it. I do not have a specific recollection of him discussing it at all. I don't think that that was one of the issues that he focused upon in his ruling. I think there's more concern with the accuracy. In the pretrial order, the final pretrial order, was it there as reasonableness of payment? I do not know if that was in the pretrial order, or I do not recall. Under normal circumstances, the question, though, is whether you are legally obligated to pay, to satisfy. That's correct. And insurance companies don't have a reputation for being charitable institutions. They only pay what they're obligated to pay. I think that's a statement that's true. All right. Thank you for your argument. Thank you. You may have two minutes for your rebuttal, since we had spent some additional time with the opposing counsel. I'd like to jump in on this computer records issue, because it is an important issue. And in modern – in these modern times, it's an important issue. Justice, you asked for authority on this issue. The V. Vinhe case from the bankruptcy appellate panel of this Court offers a – in 2005, it issued an opinion, a 336 BR 437, that offers an excellent blueprint for dealing with computerized records and the concerns that come up and questions that this Court asked were, you know, particular equipment used, policies and procedures, how the access to the database was controlled, whether it's audited, and so forth. And all these were to assure that, as Justice, you mentioned, that the record, like a file cabinet, when it goes in, that when you pull it out, you got the same thing that went in there. And that's how the Court phrased it. Here, Matouche, their witness, testified to these summaries. These summaries that he created were created at the time of his deposition, for his deposition. So they're created for trial. He did not – he testified that the adjusters would put the amounts into the system, and he had no testimony about the controls or anything about those adjusters. He didn't testify who they were. There's no testimony about the computer system itself. And therefore, there's a lack of trustworthiness. In fact, his summaries – when he was questioned at trial to connect his summary to the source data, he couldn't do it. So that shows a lack of trustworthiness to that data. It does not meet the business record, exception to hearsay, and should not have been admitted at all. Thank you. Thank you. Thank you both for your argument this morning. The view of all versus Lemberman is submitted, and we're adjourned for the morning. Thank you.
judges: Wallace, Farris, McKeown